**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MICHELLE L. MORETTI,         )    CASE NO. 4:13-CV-01344
                          )
        Plaintiff,       )
                          )    MAGISTRATE JUDGE
        v.              )    VECCHIARELLI
                          )
CAROLYN W. COLVIN,      )
    Acting Commissioner of Social   )
    Security,             )    **MEMORANDUM OPINION AND**
                          )    **ORDER**
        Defendant.     )

Plaintiff, Michelle Moretti ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1381 *et seq.* ("Act").  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

## I.   PROCEDURAL HISTORY

On January 7, 2009, Plaintiff filed her application for POD and DIB.  (Transcript ("Tr.") 12.)  On September 30, 2009, she filed her application for SSI.  (*Id.*)  In both applications, Plaintiff alleged a disability onset date of December 30, 1996.  (*Id.*)  The application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On September 14, 2011, an

ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented

by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.

(*Id.*)  On November 10, 2011, the ALJ found Plaintiff not disabled.  (Tr. 9.)  On April 24,

2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision

became the Commissioner's final decision.  (Tr. 3.)  On June 19, 2013, Plaintiff filed her

complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties

have completed briefing in this case.  (Doc. Nos. 14, 15, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ did not

adequately account for Plaintiff's limitations when determining her residual functional

capacity; and (2) the ALJ violated the treating physician rule as to Dr. Sullivan and Dr.

DiVito.

## II.   EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in December 1968 and was 28-years-old on the alleged

disability onset date.  (Tr. 28.)  She had at least a high school education and was able

to communicate in English.  (*Id.*)  She had past relevant work as an appointment clerk.

(Tr. 27.)

### B.    Medical Evidence

#### 1.    Physical Impairments

##### a.    Medical Reports

Plaintiff first complained of low back pain to chiropractor Thomas DiVito, D.C., on

2

December 9, 1997. (Tr. 1060.) Her right L4-5 was sublaxated and she had spasms over the right lateral flank and iliac crest with decreased range of motion. (*Id.*) Plaintiff continued to receive routine manipulation for strain of the lumbar spine periodically from 2001 through 2003, and on a more regular basis in September and October 2004 for lumbar strain and displacement of lumbar intervertebral disc without myelopathy. (Tr. 1050-1059.) A radiologist's report of an MRI of Plaintiff's cervical spine on December 27, 2002, showed a mild disc bulge with protrusion at the C6-7 level, mild degenerative changes throughout, and no evidence of cord compression or prevertebral soft tissue swelling. (Tr. 1048.)

On July 7, 2004, Plaintiff saw Mark Peckman, D.O., with complaints of neck pain. (Tr. 325.) Dr. Peckman found that Plaintiff had left-sided bulging discs at the C6-7 level, left-sided cervical radiculopathy, and cervical and trapezial sprain and strain. (Tr. 325-326.) Plaintiff had good and ample range of motion of her upper extremities and no deprivation in her hand grasp strength. (*Id.*) On September 2, 2004, Dr. Peckman noted that Plaintiff had progressed with epidural steroid injections, but still complained of discomfort. (Tr. 323.)

On September 4, 2004, Plaintiff returned to Dr. DiVito, who referred her for an MRI of her lumbar spine. (Tr. 327.) The MRI showed small to moderate protrusion at the L5-S1 level, causing only minimal abutment of the left S1 nerve root. (*Id.*) On September 10, 2004, Plaintiff had an MRI scan of her cervical spine that showed a moderate to large extruded disc at C5-6 with narrowing. (Tr. 328.) The mild disc bulge and protrusion at C6-7 remained unchanged since 2002. (*Id.*)

A December 9, 2004, examination by John Butler, M.D., and Iain H. Kalfas, M.D.,

3

revealed no gait difficulty, 5/5 motor strength in all extremities, normal sensation, symmetrical deep tendon reflexes, absent Babinski sign, and negative straight leg-raising.  (Tr. 441-442.)  Dr. Kalfas recommended an anterior cervical discectomy and fusion at C5-6 with fixation for diagnosis of cervical disc displacement.  (*Id.*)  On January 28, 2005, Plaintiff underwent an anterior cervical discectomy and fusion with cervical plate fixation.  (Tr. 439.)

Plaintiff returned to Dr. Kalfas on December 27, 2005, for a follow-up and complained of neck pain.  (Tr. 438.)  Dr. Kalfas noted that Plaintiff's films showed a satisfactory partial fusion at C5-6.  (*Id.*)  He recommended physical therapy.  (*Id.*)  In March 2006, Plaintiff returned to Dr. Kalfas with complaints of neck pain and a heavy feeling in her arms as well as some tingling.  (Tr. 437.)  She stated that she had started physical therapy but had no improvement in her symptoms.  (*Id.*)  Dr. Kalfas noted that Plaintiff's films looked good.  (*Id.*)  His diagnosis was cervical spondylosis.  (*Id.*)

On January 3, 2008, Plaintiff saw Richard Simmons, M.D., a primary care physician, with complaints of anxiety and low back pain after doing some lifting.  (Tr. 765.)  On examination, she had tenderness in the paravertebral muscles in the mid and lower back.  (*Id.*)  Dr. Simmons diagnosed sprains and strains lumbar, sprains and strains thoracic, and anxiety, for which Dr. Simmons prescribed Xanax.  (*Id.*)  Plaintiff returned to Dr. Simmons on January 9, 2008, with complaints of on-going pain radiating in the left leg and right arm.  (Tr. 763.)  X-rays of the cervical spine revealed post-operative fusion at C5-6, with metal plate and screws, as well as mild degenerative changes throughout the cervical spine with marked disc space narrowing at C6-7 and

4

C7-T1.  (Tr. 404.)  Examinations by Dr. Simmons revealed tenderness in the lumbar and cervical region.  (Tr. 763.)  Dr. Simmons prescribed Prednisone for Plaintiff's cervical and lumbar sprains/strains.  (Tr. 763.)

On February 14, 2008, Plaintiff reported to Dr. Kalfas with complaints of increased constant neck pain, worse on the right than left with pain and numbness radiating down her right arm and fingers.  (Tr. 435.)  She also reported intermittent low back pain that radiated into her bilateral groin area and the back of her right leg.  (*Id.*) Plain films revealed a good prior C5-6 fusion but degenerative changes at the C6-7 level.  (*Id.*)

An MRI scan of Plaintiff's cervical spine from February 21, 2008, showed left paracentral and lateral disc protrusions at C6-7 with compression of the left lateral aspect of the cord, left lateral recess, and left neuroforminal narrowing.  (Tr. 409.)  The MRI report stated that "[f]indings have significantly worsened since the prior study." (*Id.*)  Plaintiff's postsurgical C5-6 fusion, however, showed no complicating features. (*Id.*)  Computerized tomography (CT) scans from March 21, 2008, revealed post-surgical changes of anterior fusion plate and screws at C5-6, with bony fusion and loss of normal cervical lordosis.  (Tr. 455.)  Plaintiff also had degenerative changes with posterior osteophyte formation to the left at C6-7 resulting in mild flattening of the left ventral surface of the spinal cord and mild to moderate left neural foraminal narrowing and mild right neural foraminal narrowing.  (*Id.*)  At C4-5, facet and uncinate joint hypertrophy resulted in moderate left and mild right neural foramina narrowing.  (*Id.*)

On May 1, 2008, Plaintiff saw Dr. Kalfas with reports of constant neck pain and

pain and numbness down the right arm.  (Tr. 434.)  Dr. Kalfas noted that a CT

myelogram had shown a ventral epidural osteophyte at C6-7.  (*Id.*)  On August 15,

2008, Plaintiff underwent a second neck surgery involving removal of anterior cervical

instrumentation at C5-6 and anterior cervical discectomy and fusion with

instrumentation at C6-7.  (*Id.*)  In October 2008, Plaintiff no longer had arm pain or

numbness, but had frequent cervical pain and occipital headaches.  (Tr. 423.)  X-rays

showed status post discectomy and fusion extending from C5 down to C7, with plating

at C6-7.  (Tr. 444.)  The appearance was unremarkable with good alignment and no

fracture identified.  (*Id.*)

On November 25, 2008, Dr. Simmons wrote a letter on Plaintiff's behalf, outlining

specific work limitations as follows: lifting no more than 20 pounds; standing a total of

four hours per day for no more than two hours at a time without a 15-minute break; no

excessive bending or stooping; and no lifting items above shoulder level.  (Tr. 737.)

On December 15, 2008, Plaintiff told Dr. Kalfas that her neck pain radiated into

her arms and caused numbness and that her lower back was bothering her.  (Tr. 711.)

Her cervical flexion was 40, extension was 30, right and left rotation was 50, and her

lateral bending was 15.  (*Id.*)  She had tenderness along the C4-6 posterior erectors

and her reflexes were sluggish for the biceps and triceps.  (*Id.*)  Pin wheel pin prick

testing was aberrant into both hands.  (*Id.*)

On January 7, 2009, Plaintiff reported "[n]ot doing very good."  (Tr. 709.)  She

had pain along the lower lumbar spine and numbness and tingling in the feet.  (*Id.*)  Her

C5-6 and L4-5 were fixated.  (*Id.*)  She had paralumbar and paracervical hypertonicity.

(*Id.*)  Plaintiff's cervical range of motion was better on January 12, 2009.  (Tr. 708.)  Dr.

DiVito found the tightness along Plaintiff's paracervical lumbar erectors not as taut.

(*Id.*)  She had less tenderness with palpation along the upper trapezial into the lateral

scapular fold.  (*Id.*)  She was more functional with activities of daily living.  (*Id.*)  On

January 14, 2009, Dr. DiVito noted that the pain along Plaintiff's neck was not sharp

and that her numbness and tingling had also improved.  (*Id.*)

On January 16, 2009, Plaintiff saw Joseph Cerimele, D.O., for complaints of

numbness in her shoulders, arms, and hands. (Tr. 610.)  Dr. Cerimele noted that

Plaintiff's sensory, motor, and reflexes were intact.  (*Id.*)  He performed motor nerve

and sensory nerve studies that showed no evidence of neuropathy, myopathy, or

cervical radiculopathy.  (Tr. 611.)

On March 20, 2009, Dr. DiVito completed a report regarding Plaintiff's condition.

(Tr. 522.)  He reported that he had been treating Plaintiff since July 1997 for neck pain

rated as an 8 out of 10 in severity and lumbar pain rated as a 7 out of 10.  (*Id.*)  Dr.

DiVito described Plaintiff as having bilateral arm numbness and tingling into both finger

tips, as well as numbness and tingling in her legs and feet.  (*Id.*)  According to Dr.

DiVito, Plaintiff also displayed right hand weakness and decreased deep tendon

reflexes.  (*Id.*)  Plaintiff's range of motion in the cervical spine was limited to 35-45% in

all areas, and the range of motion in her lumbar spine was limited to 30% in all areas.

(*Id.*)  Dr. DiVito noted that Plaintiff's symptoms had persisted despite therapy since

about 2005.  (*Id.*)  He concluded the report by noting Plaintiff's limitations, which

included an inability to drive short distances or  "wash clothes, run sweeper, mop, make

7

beds, dishes, etc." secondary to two cervical facet surgeries at the Cleveland Clinic. (*Id.*)

Plaintiff saw Raymond Boniface, M.D., on July 13, 2009, with complaints of tingling and numbness in her left elbow, pinkie, and ring finger.  (Tr. 608.)  Dr. Boniface referred Plaintiff for a nerve conduction study on July 17, 2009.  (Tr. 590-591.)  The report indicated left ulnar myelar neuropathy at the elbow, mild left carpal tunnel syndrome, and no evidence of acute cervical radiculopathy.  (Tr. 591.)  Dr. Boniface performed a left ulnar nerve decompression on August 24, 2009.  (Tr. 592-593.)  Eight weeks post-surgery, Dr. Boniface noted that Plaintiff was "very pleased with her progress," had no numbness in her fingers, and full elbow range of motion.  (Tr. 627.)

On July 12, 2010, Dr. Simmons reviewed an MRI of Plaintiff's cervical spine.  (Tr. 714.)  The MRI results did not show any present surgical problem, but did indicate some minor disc bulges at several levels.  (*Id.*)  On examination, Plaintiff had some restriction in cervical range of motion on rotation to the right, but her grip strength remained excellent, and her reflexes remained intact for both upper extremities with no motor or sensory loss.  (*Id.*)  On August 9, 2010, Dr. Simmons noted that Plaintiff walked with a normal gait, her upper extremities were normal to inspection and palpation, and her strength was normal and symmetric.  (Tr. 712.)

On March 9, 2011, Plaintiff returned to Dr. Simmons with complaints of neck pain and some tingling and numbness in her upper extremities.  (Tr. 899.)  On examination, Plaintiff had tenderness of the cervical paravertebral muscles, but no motor or sensory loss, and her deep tendon reflexes were intact.  (*Id.*)  Dr. Simmons ordered an electromyography (EMG) of the upper extremities and cervical spine.  (Tr. 899-900.)

8

On March 24, 2011, Dr. Simmons informed Plaintiff that her recent EMG was normal. (Tr. 898.)  Dr. Simmons referred Plaintiff for a cervical myelogram on March 24, 2011. (Tr. 936.)  The report indicated no abnormal contours or areas of stenosis to the cervical spinal canal and no spinal block.  (*Id.*)  A CT scan the same day showed minimal degenerative disc disease of the cervical spine, and no evidence of fracture of the bones of the cervical spine.  (Tr. 939.)

### b.    Agency Reports

On December 31, 2009, state agency medical consultant Gary Hinzman, M.D., assessed Plaintiff's exertional limitations.  (Tr. 669.)  Dr. Hinzman concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; and sit (with normal breaks) for a total of about six hours in an eight-hour workday.  (*Id.*)  Dr. Hinzman also opined that Plaintiff would be limited to occasional handling (gross manipulation) with the left upper extremity, and limited (to an unspecified degree) with regard to pushing and pulling with the upper extremities.  (Tr. 671.)

On August 10, 2011, Hershel Goren, M.D., responded to specific interrogatories posed by the ALJ.  (Tr. 1010.)  Dr. Goren opined that Plaintiff's impairments of cervical disc degenerative disease, left ulnar neuropathy, and obstructive sleep apnea did not meet the requirements of Listings 1.04, 11.14, or 3.10, respectively.  (*Id.*)  In assessing Plaintiff's functional limitations, Dr. Goren opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, never climb ladders/ropes/scaffolds, and never work at unprotected heights.  (Tr. 1011.)

9

## 2.    Mental Impairments

### a.    Medical Reports

On February 4, 2008, Plaintiff saw Dr. Simmons with complaints of an episode of anxiety with symptoms including racing heart and nausea.  (Tr. 758.)  Dr. Simmons referred her to a psychiatrist, Nicholas A. Atanasoff, D.O., for further evaluation of her anxiety and depressive disorder.  (*Id.*)  Dr. Atanasoff noted that Plaintiff had a history of depression as well as what appeared to be a panic disorder with agoraphobia.  (Tr. 699.)  He observed that Plaintiff was well groomed, her behavior was cooperative, her thought process was organized with no delusions or suicidal or homicidal ideations, and her memory and concentration, insight, and judgment were not impaired.  (*Id.*)  Dr. Atanasoff noted that Plaintiff's mother died five months ago, which caused an exacerbation of Plaintiff's anxiety.  (*Id.*)  Dr. Atanasoff discontinued Celexa and Xanax, prescribed Paxil and Klonopin, and assessed a Global Assessment of Functioning (GAF) score of 55.[1]  (*Id.*)

Dr. Atanasoff saw Plaintiff monthly at first, and then every three months.  (Tr. 683-698.)  He adjusted her medication and conducted insight-oriented psychotherapy to help Plaintiff understand that she needed to function as fully as she could despite the stressors in her life.  (*Id.*)  On April 11, 2008, Dr. Atanastoff noted that Plaintiff was doing very well, and that the increase in Paxil helped her significantly with anxiety,

---

[1]    The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

including panic attacks.  (Tr. 697.)  On October 23, 2008, and January 21, 2009, Plaintiff reported that her anxiety was controlled significantly with Paxil.  (Tr. 693, 695.) On April 15, 2009, Dr. Atanasoff noted that Plaintiff's depression and anxiety were in full remission.  (Tr. 692.)  On July 15, 2009, Dr. Atanasoff reported that Plaintiff was tolerating her medication with no side effects and was not experiencing any depression or panic attacks.  (Tr. 691.)  On May 25, 2010, Dr. Atanasoff noted that Plaintiff had no panic attacks or anxiety, but had an acute adjustment disorder with regard to her father suffering from an illness.  (Tr. 685.)

Dr. Atanasoff's treatment notes of August 23, 2010, indicate that Plaintiff wished to see someone who provided psychotherapy and pharmacologic management.  (Tr. 945.)  Dr. Atanasoff referred Plaintiff to Dr. Labib.  (*Id.*)  Plaintiff returned to Dr. Atanasoff on February 15, 2011, reporting that she had been struggling with the separation from her husband.  (Tr. 944.)  On March 30, 2011, Dr. Atanasoff noted that Plaintiff was tolerating her medication without side effects and her anxiety was in remission, but her depression was increasing as she proceeded through her divorce. (Tr. 943.)  Dr. Atanasoff increased Plaintiff's Paxil.  (*Id.*)

On March 31, 2011, Plaintiff saw psychiatrist Brian Sullivan, M.D., for an initial evaluation and met with John Allen, M.A., for counseling sessions.  (Tr. 946-954.)  Dr. Sullivan diagnosed ADD and continued Plaintiff on Paxil and Ativan.  (Tr. 955-960.)  On August 18, 2011, Dr. Sullivan completed an assessment of Plaintiff's ability to do work-related activities.  (Tr. 1035.)  Dr. Sullivan opined that Plaintiff was mildly[2] limited in her

---

[2]     A mild limitation means the individual has a slight limitation but can generally function well (*i.e.,* on task 88%-100% of an eight-hour workday).

11

ability to perform simple tasks.  (1036.)  He opined that Plaintiff was moderately[3] limited in her ability to: relate to other people; perform activities within a schedule, maintain regular attendance, and be punctual; understand, carry out, and remember instructions; respond appropriately to co-workers; respond appropriately to changes in the work setting; and perform complex, repetitive, or varied tasks.  (Tr. 1035-1036.)  Dr. Sullivan further concluded that Plaintiff was markedly[4] limited in her ability to: attend meetings, socialize with friends/neighbors, etc.; sustain a routine without special supervision; and behave in an emotionally stable manner.  (*Id.*)  Dr. Sullivan also opined that Plaintiff was extremely[5] limited with regard to her personal habits, her ability to maintain concentration and attention for extended periods, and her ability to use good judgment. (*Id.*)  He concluded that Plaintiff's condition would likely deteriorate if she was placed under stress, especially that of a job.  (Tr. 1036.)  Furthermore, he concluded that Plaintiff's impairments or treatment would cause her to be absent from work more than three times per month.  (*Id.*)

### b.    Agency Reports

On April 23, 2009, state agency psychiatric consultant Aracelis River, Psy.D.,

---

(Tr. 1035.)

[3]    A moderate limitation means the individual is significantly limited (*i.e.,* on task 82%-88% in an eight-hour workday).  (*Id.*)

[4]    A marked limitation means the individual has a serious limitation that severely limits her ability to function (*i.e.,* on task 48%-82% in an eight-hour workday).  (*Id.*)

[5]    An extreme limitation means a major limitation with no useful ability to function (*i.e.,* on task 0%-48% in an eight-hour workday).  (*Id.*)

concluded that there was insufficient evidence on which to make a mental residual functional capacity determination for the period prior to June 30, 2003, Plaintiff's date last insured.  (Tr. 554-567.)  On September 24, 2009, Bruce Goldsmith, Ph.D., another state agency psychological consultant, affirmed Dr. River's findings.  (Tr. 612.)

On October 26, 2009, Alice Chambly, Psy.D., concluded that for the period from September 30, 2009, through the current date, Plaintiff's mental impairments of depression and anxiety disorder were not severe.  (Tr. 613-626.)

**C.    Hearing Testimony**

### 1.    Plaintiff's Hearing Testimony

Plaintiff testified that her constant neck pain was the most prevailing factor preventing her from working.  (Tr. 62.)  She described pain with standing and holding her head up.  (*Id.*)  "[I]t's a constant pain."  (*Id.*)  Plaintiff had two cervical fusions and some other treatment for her neck.  (*Id.*)  She described her current treatment as massotherapy and a little bit of physical therapy.  (*Id.*)  She wore a neck brace at her hearing and testified that she wore it anytime she was active, although it was not prescribed by a doctor.  (Tr. 76, 87.)  Plaintiff also had issues with depression.  (Tr. 70.)  Plaintiff further testified that she had her gall bladder removed and that she suffered from irritable bowel syndrome.  (Tr. 74.)

Plaintiff performed her housework a little at a time, with sitting and relaxing in between.  (Tr. 69.)  She had trouble lifting a gallon of milk. (Tr. 72.)  She could walk about a mile.  (*Id.*)  It hurt her neck and back to bend at the waist.  (*Id.*)  She could climb five steps slowly while holding on to a rail.  (Tr. 73.)  Plaintiff had trouble with focus and

13

concentration.  (Tr. 79.)  She had given up on reading because she could not focus.

(Tr. 80.)  She could watch television but often fell asleep due to her medications.  (*Id.*)

She had mood swings constantly and crying spells about once or twice a day.  (Tr. 81.)

### 2.  Vocational Expert's Hearing Testimony

Barbara Burk, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked

the VE to consider a hypothetical individual with the same educational level as Plaintiff.

(Tr. 93.)  The hypothetical individual could lift and carry 20 pounds occasionally and 10

pounds frequently; stand or walk for six hours in an eight-hour workday; sit for six hours

in an eight-hour workday; occasionally push and pull with her upper extremities; and

occasionally climb ramps and stairs but never ladders, ropes, or scaffolds.  (Tr. 93-94.)

The VE testified that the individual could perform such jobs as a cashier/checker, an

appointment clerk, and a general office clerk, both as formerly performed by Plaintiff

and as customarily performed.  (Tr. 94.)  The VE also testified that the hypothetical

individual could perform work as a cook at the light level, but not as customarily

performed.  (*Id.*)

The ALJ posed a second hypothetical to the VE, which included all of the

limitations from the first hypothetical but added the restriction of only occasional gross

manipulation with both hands.  (Tr. 95.)  The VE testified that the additional limitation

would eliminate all of Plaintiff's past work.  (*Id.*)  The VE was unable to identify any jobs

that the hypothetical individual could perform.  (*Id.*)

The ALJ posed a third hypothetical to the VE.  (Tr. 96.)  The hypothetical

individual had the ability to lift and carry 10 pounds occasionally; stand or walk two to

14

five hours in an eight-hour day; sit six hours in an eight-hour day; limited or occasional pushing/pulling with the upper extremities; occasional climbing of ramps and stairs; never climbing ropes and ladders; occasional stooping, kneeling, crouching, crawling, and reaching; and no more than frequent gross handling and gross manipulation.  (*Id.*) The VE opined that the hypothetical individual could be expected to perform past work as an appointment clerk or other jobs in the national economy, such as a cashier or telephone solicitor.  (Tr. 97-99.)

The ALJ presented a fourth hypothetical, describing an individual with the same restrictions as those described in the third hypothetical, who was also limited to performing simple, routine, repetitive tasks, and who would be absent from work on average three times a month due to her medical conditions.  (Tr. 99-100.)  The VE testified that there would be no jobs available for the individual.  (Tr. 100.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).*  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through June 30, 2003.

2.    Plaintiff engaged in substantial gainful activity in the last quarter of 1999 and early 2000.  Plaintiff has not engaged in substantial gainful activity since mid 2000.

3.    Plaintiff has the following severe impairments: cervical degenerative

16

disease with cervical discectomies and fusions, left ulnar neuropathy, mild carpal tunnel syndrome, and low back pain.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant should: only occasionally stoop, kneel, crouch, crawl, and reach; and is limited to only frequent gross manipulation.

6.  Plaintiff is capable of performing past relevant work as an appointment clerk.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.  Plaintiff was born in December 1968 and was 28-years-old on the alleged disability onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.  Plaintiff has not been under a disability, as defined in the Act, from December 30, 1996, through the date of this decision.

(Tr. 14-19.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of*

17

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.     Plaintiff's Assignments of Error

#### 1.     The ALJ Did Not Adequately Account for Plaintiff's Limitations When Determining Plaintiff's Residual Functional Capacity.

Plaintiff argues that the ALJ erred in failing to include a restriction limiting Plaintiff to occasional gross manipulation with the left upper extremity, contending that the ALJ failed to include such limitation despite the fact that state agency consultant Dr. Hinzman determined that it was appropriate.  The Commissioner argues that substantial medical evidence contradicts Dr. Hinzman's opinion that Plaintiff was limited to occasional gross manipulation with the left upper extremity.

18

In his RFC assessment, Dr. Hinzman opined, in relevant part, that Plaintiff was "limited" with regard to "[h]andling (gross manipulation)."  (Tr. 671.)  Dr. Hinzman clarified that Plaintiff was limited to "occasional manipulation LUE [left upper extremity]." (*Id.*)  During her questioning of the VE, the ALJ initially proposed a hypothetical individual who was limited to "occasional gross manipulation with both hands."  (Tr. 95.) After the VE was unable to identify any jobs that an individual with such a limitation could perform, the VE changed the hypothetical to allow for frequent gross manipulation.[6]  (Tr. 96.)  In his decision, the ALJ gave Dr. Hinzman's report "some weight" because it was "consistent with the medical evidence of record that existed at the time of Dr. Hinzman's review."  (Tr. 27.)   In her determination of Plaintiff's RFC, however, the ALJ limited Plaintiff to "frequent gross manipulation," without explaining her decision not to adopt the handling limitation recommended by the consulting physician.  (Tr. 18.)

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when

---

[6]     The VE did not testify as to whether or not a limitation to occasional gross manipulation in the left upper extremity *only* would change her testimony.

19

that evidence, if accepted, would change his analysis."). Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the ALJ did not discuss why she omitted the occasional gross manipulation with the left upper extremity limitation assigned to Plaintiff by state consultant Dr. Hinzman. Because the ALJ's calculation of Plaintiff's RFC was less restrictive than Dr. Hinzman's limitation, and, therefore, contradicted Dr. Hinzman's opinions, S.S.R. 96-8p required the ALJ to explain her decision not to include Dr. Hinzman's handling limitation in Plaintiff's RFC. The Commissioner argues that substantial evidence supports the ALJ's determination of Plaintiff's RFC, including the *frequent* gross manipulation limitation. However, the requirement of S.S.R. 96-8p is clear: where an ALJ's RFC conflicts with a medical source opinion in the record, the ALJ must explain why that opinion was not adopted.

The Commissioner argues that Plaintiff's argument lacks merit because evidence in the record supports the ALJ's determination that Plaintiff was capable of frequent gross manipulation in both the right and left upper extremities. For example, the Commissioner points to treatment notes from Dr. Simmons from June and November 2008, August 2009, and February 2010, indicating that Plaintiff had full range of motion bilaterally in her upper and lower extremities. (Tr. 727, 739, 744.) The Court agrees that there is evidence in the record that Plaintiff had the gross manipulation capability described in the ALJ's RFC. That evidence makes this question in this case a close

20

one.  The ALJ, however, did not discuss her decision to omit the limitation suggested by Dr. Hinzman, and relying on other information in the record to explain that omission would require this Court to engage in the *post hoc* rationalization that case law clearly prohibits.  *See Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) ("[A] simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action.") (internal citations omitted).

Finally, there is merit to Plaintiff's argument that she was prejudiced by the ALJ's decision not to adopt the handling limitation assigned by the state consultant.  During the administrative hearing in this case, the VE testified that an individual who was limited to occasional gross manipulation with both hands would be precluded from working in the majority of jobs.  (Tr. 95.)  The VE did not, however, specify whether an individual who was limited to occasional gross manipulation in the left upper extremity only would be unable to work.  Nor did she discuss whether such an individual would be able to work in the positions she identified as appropriate for an individual who was limited to frequent gross handling and manipulation.  Accordingly, Plaintiff is entitled to remand on this point.  On remand, the ALJ should either adopt the occasional handling (gross manipulation) with the left upper extremity limitation assigned by Dr. Hinzman, or explain her decision not to adopt it; and, if she does adopt the limitation, the ALJ should conduct an additional hearing to determine whether an individual with that limitation would be precluded from working in jobs available in the national economy.

21

### 2.  The ALJ Violated the Treating Physician Rule.

Plaintiff argues that the ALJ erred by giving less than controlling weight to the opinion of her "treating psychiatrist," Dr. Sullivan, and her "treating chiropractor," Dr. DiVito.  (Plaintiff's Brief ("Pl.'s Br.") 21.)  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

#### a.  Dr. Sullivan

Plaintiff argues that the ALJ erred by giving less than controlling weight to Dr. Sullivan.  In August 2011, Dr. Sullivan, a psychiatrist, opined that Plaintiff was mildly,

moderately, markedly, and extremely limited in certain areas of mental functioning.[7] (Tr. 1035-1036.) He also concluded that Plaintiff's impairments or treatment would cause her to be absent from work more than three times per month. (Tr. 1036.) The ALJ gave "very little weight" to Dr. Sullivan's opinion because it was "not supported by the medical evidence of record." (Tr. 17.) Plaintiff argues that the ALJ's explanation for assigning less than controlling weight to Dr. Sullivan's opinion does not satisfy the "good reasons" requirement of the treating source rule.

Plaintiff's argument that the ALJ improperly evaluated Dr. Sullivan's opinion under the treating source rule rests on the assumption that Dr. Sullivan was one of Plaintiff's treating psychiatrists, or a "treating source." A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue. *Id.*

Plaintiff's Brief on the Merits does not offer any explanation to support her assumption that Dr. Sullivan is a treating source and therefore protected by the treating source rule. In the "Statement of the Facts" section in her Brief, Plaintiff's only references to Dr. Sullivan include his intake evaluation of Plaintiff on March 31, 2011 (Tr. 958), and his completion of an "Assessment of Ability to do Work-Related Activities

---

[7]     *See supra* at 11-12.

(Mental)" from August 18, 2011 (Tr. 1035-1036).  (Pl.'s Br. 16, 17-18.)  Furthermore, while the Commissioner argues that the medical evidence of record does not support Dr. Sullivan's findings and therefore the ALJ was not obligated to give his opinion controlling weight, the Commissioner does not challenge Plaintiff's assumption that Dr. Sullivan was a treating source.  Like Plaintiff, however, the only references to Dr. Sullivan's treatment relationship with Plaintiff that the Commissioner makes in her Brief include the March 2011 initial evaluation and the August 2011 mental RFC determination.  (Defendant's Brief ("Def.'s Br.") at 11.)

"Classifying a medical source requires us to interpret the definitions in [20 C.F.R.] § 404.1502, a question of law we review *de novo*."  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).  This Court must accord substantial deference to any factual finding by the ALJ bearing on the question.  *Id.*  Here, it is not entirely clear whether the ALJ considered Dr. Sullivan to be a treating source, as the ALJ did not make a definitive finding on the record.  Furthermore, based on the little evidence from Dr. Sullivan that the parties have provided, this Court has serious doubts that Dr. Sullivan had an ongoing treatment relationship with Plaintiff such that he should be considered one of Plaintiff's treating sources.  The fact that Dr. Sullivan prescribed medications for Plaintiff's depression and anxiety and rendered an opinion regarding Plaintiff's mental limitations supports an argument that Dr. Sullivan was one of Plaintiff's treating sources.  (Tr. 958, 1035-1036.)  On the other hand,  it does not appear from the record that Plaintiff had regular appointments with Dr. Sullivan.  Moreover, when the ALJ discussed Dr. Sullivan's August 2011 opinion, she did not indicate the dates that

Dr. Sullivan treated Plaintiff or note when he began treating her.  (17.)  This suggests that the ALJ did not consider Dr. Sullivan to be a treating source.

Neither party has cited to significant evidence in the record for this Court to make a proper determination regarding Dr. Sullivan's relationship with Plaintiff.  Because it is unclear whether the ALJ considered Dr. Sullivan to be a treating source, this Court cannot properly determine whether the ALJ erred by giving less than controlling weight to Dr. Sullivan's opinion regarding Plaintiff's mental limitations.  Because Plaintiff's first assignment of error has presented a basis for remanding her case to the ALJ, the ALJ is hereby directed to explain on remand whether she considers Dr. Sullivan to be one of Plaintiff's treating sources, the weight accorded to Dr. Sullivan's opinion, and the reasons therefor.

> **b.    Dr. DiVito**

Plaintiff argues that the ALJ erred by giving less than controlling weight to the opinion of Dr. DiVito, Plaintiff's chiropractor.  The Commissioner responds that the ALJ was not required to give controlling weight to Dr. DiVito under the treating source rule, because a chiropractor is not an "acceptable medical source."

Here, the ALJ did not err by giving little weight to Dr. DiVito's opinion regarding Plaintiff's physical limitations, because a chiropractor is not a medical source entitled to controlling weight under the treating source rule.  *See Walters v. Comm'r of Soc. Sec.,* *127 F.3d 525, 530 (6th Cir. 1997)*.  In *Walters,* the Sixth Circuit concluded that "logic and the plain language of the regulations suggest that a treating source under 20 C.F.R. § 404.1527(d)(2) must be a *medical* source and that a chiropractor is not a medical source."  *Id.* (emphasis in original).  The Court explained:

> The controlling weight provision is found under a section heading that refers specifically to medical opinions, and in the regulations chiropractor opinions are not listed as one of the five types of "acceptable medical sources" but are listed under the separate heading of "other [nonmedical] sources." *Compare* 20 C.F.R. § 404.1513(a) (1997) *with* 20 C.F.R. § 404.1513(e) (1997). We, therefore, must agree with the Second Circuit's conclusion that under the current regulations, the ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion based on all evidence in the record, since a chiropractor is not a medical source.

*Id.* (citing *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)). Thus, because the regulations do not treat chiropractors in the same way that they treat licensed physicians, Dr. DiVito is not an "acceptable medical source" whose opinion was entitled to controlling weight.

In *Walters,* the Court held that although the plaintiff could offer his chiropractor's opinions to help the Commissioner assess the extent to which his impairments affected his ability to work, "the ALJ was not required to adopt the opinions of a treating chiropractor nor to give them controlling weight." *Id.* at 530-31. Here, the ALJ acknowledged that on March 20, 2009, Dr. DiVito opined that Plaintiff could not wash clothes, run a sweeper, mop, make beds, do dishes, or drive short distances. (Tr. 27, 522.) The ALJ gave "little weight" to that opinion, noting that Dr. DiVito "did not provide any detailed reasoning for his conclusions" and that "the objective findings he provide[d] [we]re vague and limited." (Tr. 27.) Because the ALJ was not required to give any more deference to Dr. DiVito's opinion than she did in her decision, and because Dr. DiVito is not a treating source, Plaintiff's claim that the ALJ erred by giving less than controlling weight to Dr. DiVito's opinion is without merit.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and

26

REMANDED  for proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 6, 2014